**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| M. NORMAN DONNENFELD, on Behalf of Himself and All Other Persons Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>PETRO, INC. d/b/a PETRO HOME SERVICES.<br><br>Defendant. | Civil Action No.:17-cv-2310<br><br><br>Civil Action<br><br>CLASS ACTION COMPLAINT AND JURY DEMAND |

Plaintiff M. Norman Donnenfeld, by and through his undersigned counsel, individually and on behalf of all others similarly situated individuals (the "Class"), as defined below, alleges the following facts and claims upon personal knowledge and upon information and belief as to all other matters as follows:

## I.    IDENTIFICATION OF PARTIES

1.    The parties to this action are (i) M. Norman Donnenfeld, residing at 60 Spruce Drive, Roslyn, New York, 11576, and (ii) Petro Inc. a Delaware Corporation headquartered at 9 West Broad Street, Stamford, Connecticut d/b/a Petro Home Services with a business address of 3 Fairchild Court, Plainview New York 11803 ("Petro").

## II.   THE NATURE OF THE ACTION

2.    Homeowners who use oil to heat their homes (including for heating systems and hot water) typically contract with a heating oil provider to have oil delivered to their home at

1

regular intervals and pay for the oil by the gallon. Because oil prices fluctuate based upon global market conditions there are various pricing plans available to the homeowners. These plans typically require a year-long commitment and will impose a substantial termination fee if the homeowner decides to cancel the contract early or change to a different pricing plan with the same company prior to the expiration of the contract period.

3.    Petro advertises itself as one of the largest home heating oil providers in America with over 100 years' experience "helping customers keep comfortable at home and save on energy costs."

4.    Petro explains the pricing options available to customers on its website as follows:

## Pricing plan comparison

| PLAN | TIME COMMITMENT | PRICE PER GALLON | PRICE PROTECTION |
|------|-----------------|------------------|------------------|
| Variable | None | Fluctuates with market conditions | No |
| Ceiling | One year | Fluctuates with market conditions but will not go above the ceiling limit | Yes |
| Fixed | One year | Stays fixed – will not go up or down | Yes |

2

**Variable Plan**
The Variable plan has an attractive rate that fluctuates up and down with market conditions. There are no price protection cost or termination fees associated with this plan.

**Fixed Plan**
Our Fixed Plan requires a 1-year commitment to Petro. The oil price remains the same for every delivery, for every gallon throughout the year, regardless of market conditions. Petro pre-purchases all of your oil and assumes all risk, so if you terminate your account prior to the expiration of your contract, an early termination fee of $599.00 will be assessed.

**The Petro Ceiling Plan**
Many customers feel this plan is a better option than the fixed price plan as it gives you a limit on how high your price can go and hopefully take advantage of lower prices in the future. The price will trend up or down based on market conditions at the time each delivery is made but will never exceed a set limit. A 1-year commitment to Petro is required for this plan. Similar to the fixed plan, Petro protects the cost of your oil and assumes all risk, so if you terminate your account prior to the expiration of your contract, an early termination fee of $399.00 will be assessed.

**http://www.petro.com/oil-propane/heating-oil-prices**

5.     In addition to the representations on its website that customers who opt for the ceiling plan will be able to take advantage of lower oil prices, representatives of Petro advise customers, including the named Plaintiff, both orally and in writing that the ceiling price will vary based upon market conditions.

6.     Notwithstanding its oral and written representations, Petro has an unstated policy or practice of unilaterally and without justification, not reducing the per gallon price to customers who have entered into a  Petro ceiling plan agreement even as oil prices fall, and instead charge Petro ceiling plan

3

customers the top of the ceiling price per gallon on a regular basis. As a result, customers are not receiving the benefit of entering into or switching to a Petro ceiling plan and are essentially treated as though they have opted for the fixed price plan. In essence they are not receiving the main benefit they contracted for by making a year-long commitment to Petro.

7.    Customers who sign up for Petro's ceiling plan are not receiving the promised benefits of favorable market price fluctuations.  Customers who then decide to terminate Petro's ceiling plan based on Petro having failed to deliver the promised benefits of favorable market price fluctuation are then charged an "early termination fee" for doing so.  Customers who originally switched from Petro's fixed plan to Petro's ceiling plan were charged "early termination fees" for benefits never received.

8.    Plaintiff brings this action on behalf of himself and all other persons who were injured by Defendants' failure to abide by the expressly stated and advertised promise that oil delivery customers who contract and pay for the "Petro Ceiling Plan" will benefit when oil prices drop.

9.    Plaintiff seeks actual damages, injunctive relief, restitution and/or disgorgement of profits, statutory damages, attorneys' fees, costs, and all other relief available to the Class.

### III. **PARTIES**

10.   Plaintiff M. Norman Donnenfeld, is an individual residing at 60 Spruce Drive, Roslyn, New York, 11576 ("Donnenfeld"). He brings this action in both his individual capacity and on behalf of all others similarly situated.

11.   Petro Home Services is a business entity described as a local brand name of Petro Holdings, Inc. and Petro Inc. (herein collectively "Petro") Petro Home Services has offices located at 3 Fairchild Court, Plainview, New York 11803.

12.   Petro, Inc. is a corporation of the State of Delaware, with a principal place of business at 9 West Broad Street, Stamford, Connecticut 06902. Petro, Inc. maintains an office and employees at 1000 Woodbury Road, Suite 110, Woodbury, New York 11797. Petro, Inc. provides heating oil and services to customers in New York, among other places, and maintains a call center in the State of New York. Petro, Inc. is registered to do business with the New York State Department of State and has a registered agent for service of process, Capitol Services, Inc. 1218 Central Ave., Suite 100, Albany, New York 12205. Petro, Inc. is an operating subsidiary of Star Gas Partners, L.P.

### IV.   **JURISDICTION AND VENUE**

13.   This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §1332(d)(2), because at least one class member is of diverse citizenship from the Defendant, a corporation incorporated in the State of Delaware; there are more than 100

class members nationwide; and the aggregate amount in controversy exceeds $5,000,000.

14. The court has personal jurisdiction over the parties because Petro, Inc. d/b/a Petro Home Services has numerous contacts with New York, including marketing and sale of home heating oil to the plaintiff and others in this state, and several offices, employees and representatives within New York. Additionally, this Court has personal jurisdiction over Petro, Inc. by virtue of this corporation's registering to do business in New York and appointing an agent for service of process.

15. Venue is proper in this District under 28 U.S.C. § 1391 because Donnenfeld is a New York resident and Petro's conduct has injured Class Members residing in this District. Petro transacts business and maintains several offices and depots within this District. Accordingly, this court has personal jurisdiction over the defendants and venue is proper in this Judicial District.

16. The Federal Courthouse located in East Islip is the proper vicinage for this matter because Plaintiff and Defendant both reside in Nassau County, New York.

## V.    FACTUAL BACKGROUND

17. On its website, Petro represents itself to be one of the largest local home heating oil and total home comfort services providers in America, with over 100 years' experience helping customers keep comfortable at home and save on energy costs.

6

**18.** This is consistent with information contained in the 10K of Petro's parent company, Star Gas Partners, L.P. which describes its business as follows:

> We are a home heating oil and propane distributor and service provider to residential and commercial customers who heat their homes and buildings in the Northeast, Central and Southeast U.S. regions. Our customers are principally in the more northern and eastern states. As of September 30, 2015, we sold home heating oil and propane to approximately 458,000 full service residential and commercial customers. We believe we are the largest retail distributor of home heating oil in the United States, based upon sales volume with a market share in excess of 5.5%. We also sell home heating oil, gasoline and diesel fuel to approximately 76,000 customers on a delivery only basis.. .
> During fiscal 2015, total sales were comprised approximately 71.7% from sales of home heating oil and propane; 14.6% from the installation and repair of heating and air conditioning equipment and ancillary services; and 13.7% from the sale of other petroleum products. We provide home heating equipment repair service 24 hours a day, seven days a week, 52 weeks a year. These services are an integral part of our business, and are intended to maximize customer satisfaction and loyalty.
> We conduct our business through an operating subsidiary, Petro Holdings, Inc., utilizing over 35 local brand names such as Petro Home Services, Burke Energy, Atlas Glen-mor, and Griffith Energy Services, Inc. to name a few. (from 2015 10K at p.5)

**19.** According to this 10K its operating subsidiaries sell home heating oil and propane in the following locations:

| *Maine* | *New York* | *New Jersey* | *West Virginia* |
|---|---|---|---|
| York | Albany | Atlantic | Berkeley |
| | Bronx | Bergen | Jefferson |
| *New Hampshire* | Columbia | Burlington | Morgan |
| | Dutchess | Camden | |

Hillsborough
Merrimack
Rockingham
Strafford

***Vermont***
Bennington

***Massachusetts***
Barnstable
Bristol
Essex
Hampden
Middlesex
Norfolk
Plymouth
Suffolk
Worcester

***Rhode Island***
Bristol
Kent
Newport
Providence
Washington

***Connecticut***
Fairfield
Hartford
Litchfield
Middlesex
New Haven
New London
Tolland
Windham

Fulton
Greene
Kings
Montgomery
Nassau
New York
Orange
Putnam
Queens
Rensselaer
Richmond
Rockland
Saratoga
Schenectady
Schoharie
Suffolk
Sullivan
Ulster
Warren
Washington
Westchester

***Maryland***
Anne Arundel
Baltimore
Calvert
Caroline
Carroll
Cecil
Charles
Dorchester
Frederick
Harford
Howard
Kent
Montgomery
Prince George's
Queen Anne
St. Mary's
Talbot
Washington

***Washington, D.C.***
District of Columbia

***Delaware***
Kent
New Castle
Sussex

Cumberland
Essex
Gloucester
Hudson
Hunterdon
Mercer
Middlesex
Monmouth
Morris
Ocean
Passaic
Salem
Somerset
Sussex
Union
Warren

***Pennsylvania***
Adams
Berks
Bucks
Chester
Cumberland
Dauphin
Delaware
Franklin
Fulton
Lancaster
Lebanon
Lehigh
Monroe
Montgomery
Northampton
Perry
Philadelphia
Schuylkill
York

***Virginia***
Arlington
Clarke
Fairfax
Frederick
Fauquier
Loudoun
Prince William
Stafford
Warren

***Tennessee***
Bradley
Hamilton
McMinn
Meigs
Polk

***North Carolina***
Union County

***South Carolina***
Bamberg
Calhoun
Chester
Dorchester
Fairfield
Kershaw
Lexington
Orangeburg

***Georgia***
Banks
Cherokee
Dawson
Fannin
Franklin
Forsyth
Habersham
Hall
Jefferson
Lumpkin
Murray
Rabun
Stephens
Towns
White
Whitfield

20. The 10K describes the types of pricing plans offered by Star Partners subsidiaries as follows:

> **We offer several pricing alternatives to our residential home heating oil customers. Our variable pricing program allows the price**

to float with the home heating oil market and other factors. In addition, we offer price-protected programs, which establish either a ceiling or a fixed price per gallon that the customer would pay over a defined period. The following chart depicts the percentage of the pricing plans selected by our residential home heating oil customers as of the end of the fiscal year.

|  | September 30, | | | | |
|  | 2015 | 2014 | 2013 | 2012 | 2011 |
|---|---|---|---|---|---|
| Variable | 51.4% | 53.5% | 53.1% | 54.7% | 54.9% |
| Ceiling | 43.9% | 40.8% | 42.3% | 40.5% | 41.5% |
| Fixed | 4.7% | 5.7% | 4.6% | 4.8% | 3.6% |
|  | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

(2015 10K at p. 9)

21. The parent company, Star Partners LP, details in its 10K the supply arrangements for inter alia home heating oil sold by its subsidiaries, as follows:

We purchase our product for delivery in either barge, pipeline or truckload quantities, and as of September 30, 2015 had contracts with approximately 110 third-party terminal sites for the right to temporarily store petroleum products at their facilities. Home heating oil and propane purchases are made under supply contracts or on the spot market. We have entered into market price based contracts for approximately 85% of our expected home heating oil and propane requirements for the fiscal 2016 heating season. We also have market price based contracts for approximately 23% of our expected diesel and gasoline requirements for fiscal 2016.

During fiscal 2015, Global Companies LLC and NIC Holding Corp. provided approximately 12% and 10%, respectively, of our petroleum product purchases. No other single supplier provided more than 10% of our product supply during fiscal 2015. For fiscal 2016, we generally have supply contracts for similar quantities with Global Companies LLC and NIC Holding Corp. Supply contracts typically have terms of 6 to 12 months. All of the

**supply contracts provide for minimum quantities and in most cases do not establish in advance the price of home heating oil or propane. This price is based upon a published market index price at the time of delivery or pricing date plus an agreed upon differential. We believe that our policy of contracting for the majority of our anticipated supply needs with diverse and reliable sources will enable us to obtain sufficient product should unforeseen shortages develop in worldwide supplies.**

22.    **Star Gas Partners also discusses the pricing volatility of home heating oil in its 10K and provides four years of pricing, as follows:**

**In recent years, the wholesale price of home heating oil has been extremely volatile, resulting in increased consumer sensitivity to heating costs and increased gross customer attrition. Like any other market commodity, the price of home heating oil is generally impacted by many factors, including economic and geopolitical forces. The price of home heating oil is closely linked to the price refiners pay for crude oil, which is the principal cost component of home heating oil. The volatility in the wholesale cost of home heating oil, as measured by the New York Mercantile Exchange ("NYMEX") price per gallon for the fiscal years ended September 30, 2011 through 2015, on a quarterly basis, is illustrated by the following chart:**

| Quarter Ended | Fiscal 2015 (1) | | Fiscal 2014 (1) | | Fiscal 2013 (1) | | Fiscal 2012 | | Fiscal 2011 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Low | High | Low | High | Low | High | Low | High | Low | High |
| December 31 | $1.85 | $2.66 | $2.84 | $3.12 | $2.90 | $3.26 | $2.72 | $3.17 | $2.19 | $2.54 |
| March 31 | 1.62 | 2.30 | 2.89 | 3.28 | 2.86 | 3.24 | 2.99 | 3.32 | 2.49 | 3.09 |
| June 30 | 1.68 | 2.02 | 2.85 | 3.05 | 2.74 | 3.09 | 2.53 | 3.25 | 2.75 | 3.32 |
| September 30 | 1.38 | 1.84 | 2.65 | 2.98 | 2.87 | 3.21 | 2.68 | 3.24 | 2.77 | 3.13 |

23.    **On August 7, 2013, Donnenfeld entered in a fixed plan home heating oil contract with Petro. This contract, entitled a**

Retail Fuel Delivery and Services Agreement, provided in relevant part:

> Pricing: For the period 8/07/13 through 08/31/2014 (Pricing Period), Petro will deliver fuel to you at a fixed price of $3.649 per gallon plus applicable taxes if any. In exchange for this Fixed Price, you agree to purchase your heating oil requirements exclusively form[sic] Petro during the Pricing Period on an automatic basis, and remit all outstanding balances when due. . . . This Fixed Price will expire at the end of the Pricing Period without further notification, and all subsequent deliveries will be made at a variable price, which fluctuates with market conditions. If your account is cancelled for any reason, or if you remove yourself from automatic deliver prior to the expiration date, you will be charged a $599.00 early termination fee in addition to any outstanding balance owed.

A true and correct copy of this agreement is annexed hereto as Exhibit A.

24. On July 30, 2014, Donnenfeld entered into a renewal fixed price heating oil agreement which was memorialized by a letter from Mike Perna, President and General Manager of the Plainview, New York office of Petro Home Services. This letter agreement provided in relevant part:

> For the period 9/1/2014 through 8/31/2015 ("Pricing Period), Petro will deliver fuel to you at a fixed price of $3.699 per gallon ("Fixed Price") plus applicable taxes if any. In exchange for this Fixed Price, you agree to purchase your heating oil requirements exclusively from Petro during the Pricing Period on an automatic basis, and remit all outstanding balances when due. . . . This Fixed Price will expire at the end of the Pricing Period without further notification, and all subsequent deliveries

> will be made at a variable price, which
> fluctuates with market conditions. If your
> account is cancelled for any reason, or if
> you remove yourself from automatic delivery
> prior to the expiration date, you will be
> charged a $599.00 early termination fee in
> addition to any outstanding balance owed.
> With your permission, we recorded the
> conversation detailing the terms of this
> Fixed Price agreement, and will retain a
> copy of that recording for your protection.

A true and correct copy of this letter agreement is annexed
hereto as Exhibit B.

25. In December of 2014 the price of heating oil went down
significantly. Donnenfeld determined, after examining his
options on the Petro website, that the fixed plan no longer made
economic sense and it would be economically beneficial for him
to switch to the ceiling plan because he would save money if oil
prices continued to fall. Consequently, Donnenfeld telephoned
Mike Perna, paid a $300 Early Termination Fee, and switched to
a ceiling price plan. This new contract was memorialized by a
letter from Mike Perna which provided in relevant part:

> For the period 12/5/2014 through 12/31/2015
> ("Pricing Period"), Petro will deliver fuel
> to you and your price will not exceed $2.899
> per gallon ("Ceiling Price") plus
> applicable taxes if any. Your actual
> delivered price, which includes the cost of
> the ceiling protection, will vary based on
> market conditions, including but not
> limited to, product availability, wholesale
> cost and other factors, but will not exceed
> the Ceiling Price during the Pricing Period.
> In exchange for this Ceiling Price, you
> agree to purchase your heating oil
> requirements exclusively from Petro during
> the Pricing Period on an automatic delivery
> basis, and remit all outstanding balances
> when due.. . .The Ceiling Price will expire

**at the end of the Pricing Period without
further notification, and all subsequent
deliveries will be made at a variable price,
which fluctuates with market conditions. If
your account is cancelled for any reason,
or if you remove yourself from automatic
delivery prior to the expiration date, you
will be charged a $399.00 early termination
fee in addition to any outstanding balance
owed. With your permission, we recorded the
conversation detailing the terms of this
Ceiling Price agreement, and will retain a
copy of that recording for your protection.**

A true and correct copy of this letter agreement is annexed
hereto as Exhibit C.

26. Although oil prices continued to fall dramatically,
and Petro's own website proclaimed that "Oil prices at near 5-
year lows!" two months after entering into the ceiling plan and
at all times thereafter, Petro delivered oil to Donnenfeld at
$2.899 (the ceiling price). More specifically, on December 27,
2014 Petro delivered oil to Plaintiff at $2.859 per gallon. On
January 17, 2015 Petro delivered oil to Plaintiff at $2.509 per
gallon. On February 8, 2015 Petro delivered oil to Plaintiff at
$2.659 per gallon. On February 28, 2016 Petro delivered oil to
Plaintiff at $2.899 per gallon, and this ceiling price remained
for the March 17, 2105, April 15, 2015, September 21, 2015 and
December 5, 2015 deliveries, although the price of home heating
oil had continued to drop during this time period. A true and
correct copy of Plaintiff's invoices are annexed hereto as
Exhibit D.

27. Donnenfeld became concerned that he was not reaping
the benefits of having switched to a ceiling price plan after

paying the early termination fee. Consequently, on December 14, 2015, he asked his son to help confirm whether his suspicions were correct. Plaintiff's son called Petro's Plainview, New York location, which is the depot where Donnenfeld received his heating oil from, and asked for a current price quote for each of the plans Petro offered. The Petro employee checked the prices and advised Mr. Donnenfeld's son that Petro was charging a variable price of $1.99, a fixed price of $2.29 and a ceiling price of $2.35. Meanwhile, Donnenfeld had been charged $2.899 a gallon for a delivery made on December 5, 2015, barely a week before the phone call.

28. As a further confirmation that Plaintiff was not receiving the benefits of switching to a ceiling plan, Donnenfeld checked with his daughter. Donnenfeld's daughter, who also lives on Long Island, New York and has oil heat, obtained a ceiling plan in March 2015 with another heating oil company known as Patterson Energy Group. (When Donnenfeld's son telephoned Patterson he was advised that they are an affiliate of **Petro.)** Her ceiling plan price began at $2.819 a gallon and she saw her prices fall steadily. For example, on February 28, 2015 while Plaintiff was being charged the ceiling price of $2.899, his daughter received a delivery on March 9, 2015 and was charged $2.749 per gallon. On March 17, 2015 Plaintiff received a delivery and was charged $2.899 per gallon, however on April 6, 2015 his daughter was charged $2.549 per gallon for her delivery. On April 15, 2015 Plaintiff was again charged the

ceiling price for a delivery while his daughter was charged $2.810 per gallon for a delivery on May 11, 2015. On September 21, 2015 Plaintiff was charged the ceiling price of $2.899 while three days later, on September 24, 2015 his daughter was charged $2.449. By December 2015 Plaintiff's daughter was paying $2.249 per gallon while Donnenfeld was still paying $2.899. A true and correct copy of Plaintiff's daughter's bills are annexed hereto as **Exhibit E**.

29. The fact that Plaintiff was consistently charged significantly more than the price being charged by other retailers in Nassau County, despite having a ceiling contract which offered the inducement that customers would reap the benefits of falling prices, is confirmed by a review of the average pricing data collected by the New York State Energy Research and Development Authority (NYSERDA) for the Long Island Region during this time period, as reflected in the chart below:

## Long Island Region
Nassau and Suffolk counties
**Monthly Average Home Heating Oil Prices (in cents per gallon)**

| | Sept. | Oct. | Nov. | Dec. | Jan. | Feb. | Mar. | Apr. | May | June | July | Aug. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2016-17** | 254.0 | 263.4 | 262.6 | 276.9 | 283.8 | 286.5 | 285.5 | | | | | |
| **2015-16** | 273.9 | 269.9 | 267.0 | 252.0 | 242.9 | 239.2 | 241.6 | 243.6 | 255.7 | 260.4 | 256.2 | 254.4 |
| **2014-15** | 390.4 | 373.8 | 365.5 | 344.3 | 317.4 | 322.1 | 334.6 | 312.7 | 310.6 | 305.6 | 295.7 | 282. |

https://www.nyserda.ny.gov/Researchers-and-Policymakers/Energy-Prices/Home-Heating-Oil/Monthly-Average-Home-Heating-Oil-Prices

30.   Thus, on February 28, 2015 while Donnenfeld was paying $2.889 the average price in his locality was $2.429. On March 17, 2015 he was still paying the ceiling price while the average price was $2.392. On April 15, 2015 he was paying the ceiling price while the average price was $2.416.

31.   Internet research reveals that Donnenfeld's experience with respect to Petro's charging the ceiling price shortly after the customer signs a ceiling contract is widespread. Numerous individuals have complained about the same practices experienced by Donnenfeld, as reflected on various websites, including **www.consumeraffairs.com**. With respect to the veracity of customer reviews on this website, the FAQ's indicate that "726,333 reviews on ConsumerAffairs are verified. We require contact information to ensure our reviewers are real. We use intelligent software that helps us maintain the integrity of reviews. Our moderators read all reviews to verify quality and helpfulness."

32.   Below is just a smattering of the reviews of Petro found on this website:

- **John of Pennington, NJ on Jan. 7, 2016**
  **I too like everyone it seems got the bait and switch price ceiling plan by Petro. When I signed up for the plan, the ceiling price (after initially being offered over $3 per gallon in the fall) was given to me at 2.69 per gallon. The fill price under the plan I was told was $2.39 per gallon but if prices dropped then I would drop as well. As we all know oil prices dropped close to 25% since I signed up for the plan. My next delivery a few days ago instead at a lower price was at the ceiling price of $2.69 per gallon. So the price of heating oil everyone goes down and Petro's price goes up way higher.**

The ceiling plan is really just a bait and switch and is in their eyes a fixed rate plan. They will tell you how low their price is when you sign up and then when you get a delivery they go right to the ceiling price and rip you off. IF ANYONE IS INTERESTED IN STARTING A CLASS ACTION LAWSUIT for BAIT and SWITCH practices that they employ I and probably tens of thousands others are ready to go. They have been doing this for years. Offer a ceiling plan where your price is supposed to drop when prices decrease and then deliver at the ceiling price no matter if the price of heating oil everywhere has dropped by half.

- Richard of Westfield, NJ on Dec. 23, 2015
  Knowing oil was going down sharply 6 months ago, I asked Petro if the lower price on oil would be reflected in my next oil delivery. They signed us up on their ceiling contract. Well 12/22/15 they deliver oil, charging $3.09. I called Petro and found their current price was $1.79. I called Petro to get an answer. After being passed around from Luke, Paul, forgot the 3rd person, finally a supervisor - DANA. She said after my rank, she said she would call me right back. I am still waiting after two days. No call.
  I call back and Ceryll said DANA was not at her desk, but she would leave a message to call me back. No call. We have used Petro for over 24 years. They treat us like they don't know us. I always heard the negative, that long term customers suffer for being loyal. They get shafted. I am cancelling Petro and spreading the news. They are terrible. Petro is not out to give honest, ethical service. They are out to make as much money as they can. SHAME, SHAME, SHAME.

- D. of Andover, NJ on Oct. 27, 2015
  DO NOT SIGN A CONTRACT WITH PETRO OIL!!! You will pay double for your heating oil. Do not be fooled by Petro's ceiling price protection. You will pay ceiling price regardless of market fluctuations. Oil prices in August 2015, $1.80. Petro charged me $3.30. Bait and switch is their policy. Their service contract that I paid $325.00 was honored only after I paid a plumber to diagnose the problem. They sent two technicians who mysteriously found no issues. The fact that this company has not been investigated by the Utilities Commission is shocking.

- Louise of Harrison, NY on Oct. 16, 2015
  I signed a contract and capped my oil to 3.10 as the highest, my oil bill would be a galleon. But was told if the price is lower, I would be charged a lower price. So, I called to find out the cost of oil and was told 2.79.9. When I spoke to other people who just received their deliveries, they paid 1.99 and 2.21. I called Petro and

advised them and they said this was the going rate. I could sign on to the government's website for the rate. So I did and the rate was 2.55. I called back and they didn't care. I am very unhappy with this company. Castle oil was so much better. I wish they didn't sell their business to these crooks. I have learned now the worst thing to do is sign a contract because once you do, they take advantage. Something should be done to regulate these companies - it's just not fair. Last year oil was higher and I paid 2.55. I would never recommend this company.

- **Evelyn of New Milford , CT on Aug. 22, 2015**
  We, along with any others, locked into a fairly high capped rate plan and when the prices dropped the prices remained the same or only very slightly lower. When I spoke to a customer service representative they offered no compensation or explanation. Very disappointed.

- **Dennis of Southbury, CT on June 10, 2015**
  I have been a Petro heating oil customer for several years. I have always dealt with larger suppliers for assurance of supply and recognize that I pay somewhat of a premium. I got a ceiling price contract at 3.44/gal last November when whole heating oil was about 2.45/ gal. Even though wholesale heating oil nosedived to 1.60 to 1.80 in early 2015 my price barely moved below the ceiling. My most recent delivery was at the ceiling with a wholesale of about 1.90. When I questioned they gave me all kinds of bad excuses. They said their current standard delivery price is 3.599. Based on State of Ct data, this is the highest price in the state with the average at 2.77/gal. I told them that I was going to go to a new supplier and mentioned Superior Plus (another very large supplier). The women said she never heard of them. BOTTOM LINE I WILL NEVER BUY FROM PETRO AGAIN AND SUGGEST THAT OTHERS FIND ANOTHER SUPPLIER. By the way I called a smaller full-service supplier that I have dealt with previously and they said their standard delivery price today is 2.75.

- **J of Bronx, NY on April 1, 2015**
  ** at Petro is a scam artist. I have a ceiling plan that calls for me to pay less when oil drops in price, but I am paying the top of my ceiling. I'm paying way over 1.00 a gallon compared to other comparable local companies with a ceiling plan, plus I paid about 300 for a service contract, which I haven't had to use other than the cleaning they give for free. I wouldn't put it past them to put an oil nozzle that shoots excess oil into the burner just to waste more oil and make me go through more oil than I have to. I hate Petro and will never use them again. Rotten rat **.

- **Peter of Avon, CT on Feb. 25, 2015**
  **PETRO has raised oil prices recently far in excess of what is reasonable market conditions. This week I paid 75 cents more a gallon for home heating oil than the majority of providers servicing this part of CT who are delivering this week ($3.45 vs. $2.70 per gallon). Reference. PETRO quickly went the maximum ceiling price and have raised prices about 10% in the last few weeks. Earlier deliveries this season were in the $3/gallon range. So for a 200 gallon delivery, I overpaid by $150 compared to reputable delivery companies in the area. The $399 early termination charge leaves no room to challenge or stop deliveries. The current price increases have been egregious.**
  **There is little other way to see this than PETRO is taking advantage of their existing client base that is locked into a contract during an excessively harsh winter. When asked, Customer Service apologized for my dissatisfaction but offered no explanation other than "prices are what they are" and you can change it when your contract expires. There is no protection for the customer against this type of price gouging. Clearly PETRO should not be considered when deciding on oil providers.**

- **Russell of Huntington Station, NY on Dec. 3, 2014**
  **Just got an automatic delivery with my Petro Contract. It is one where there is a cap as a maximum. It is December 2nd, 2014. I am under contract until 3/31/15 and will definitely cancel never to use them or any affiliates again. I was a little miffed at the fact that each of the oil deliveries was on average 50 cents higher than the highest credit card spot market oil delivered or other oil company prices that I called on the day of delivery to match prices. Not cash on delivery, check or credit card. And for the same amount of oil. It was usually 10 to 15 cents below my cap. Well as you know oil prices have dropped considerably. Other oil Companies on this day was on average $2.799 a gallon. Petro's delivery charged my cap limit of $3.899 that is $1.10 above the average. A whopping $230 more just for this delivery. Say goodbye to this company who just wants to take your money. I estimate it will cost me about $900 more this season for oil. STAY AWAY from this contract scam.**

Source:
[http://www.consumeraffairs.com/utilities/petro oil.html?page=7](http://www.consumeraffairs.com/utilities/petro oil.html?page=7)

33.   **On February 18, 2016, Donnenfeld filed a Class Action Complaint and Jury Demand in the United States District Court**

for the District of New Jersey seeking relief for Defendants wrongful practices. Star Gas Partners, Petro's parent company, acknowledged the existence of the litigation in its 2016 10K, wherein it stated:

> On February 18, 2016, a civil action was filed in the United States District Court, District of New Jersey, entitled *M. Norman Donnenfeld v. Petro Home Services, Petro Holdings Inc. and Petro, Inc.,* Civil Action Number 2:16-cv-00882 JMV-JBC, against Petro Home Services which is a brand name, Petro Holdings Inc. and Petro, Inc. Plaintiff alleges he did not receive expected contractual benefits under his protected price plan contract when oil prices fell and asserts various claims for relief including breach of contract, violation of the New York General Business Law and fraud. The Plaintiff also seeks to have a class certified of all customers of the defendants in the United States who entered into protected price plan contracts and were denied the same contractual benefits and to be appointed to represent them. No class has yet been certified in this action. The Plaintiff seeks compensatory, punitive and other damages in unspecified amounts. On May 9, 2016, the Partnership filed a motion to dismiss the complaint for lack of personal jurisdiction and failure to state a claim for relief and to strike the class action allegations. The motion was fully briefed and submitted to the court on July 12, 2016 and no decision has been issued yet. The Partnership believes the allegations lack merit and intends to vigorously defend the action; at this time we cannot assess the potential outcome or materiality of this matter. (from 2016 10K)

34. On March 24, 2017 Judge John Michael Vazquez, of the United States District Court for the District of New Jersey issued an Opinion and Order granting Defendants' motion to dismiss for lack of personal jurisdiction. In dicta, Judge Vazquez stated that he believed the pleadings were otherwise deficient but granted leave to replead within 30 days. Instead of filing an Amended Complaint in the District of New Jersey Plaintiff has opted to file the instant action in a jurisdiction

where the Defendants are unquestioningly amenable to personal jurisdiction. Plaintiffs have replead the allegations that were initially plead in the New Jersey Action and included additional details which address the perceived deficiencies.

## VI. <u>CLASS ACTION ALLEGATIONS</u>

35.  Plaintiff brings this action on behalf of himself and all others similarly situated as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure.

36.  The Class and Sub-classes which Plaintiff seeks to represent is defined as follows:

(a)  The "Class": All persons in the United States who entered into a ceiling price agreement with Petro and who were thereafter charged the ceiling price for oil deliveries even though the average market price for home heating oil in that region on the day of delivery had fluctuated downward. "Persons" includes individuals as well as profit and not-for-profit corporations, partnerships, limited liability companies, limited liability partnerships, joint ventures, sole proprietorships, associations, firms, trusts or other business or governmental entities.

(b)  Subclass consisting of all members of the Class who reside in New York State.

(c)  Subclass consisting of all members of the Class who paid an early termination fee to Petro to switch from a fixed price agreement to a ceiling price agreement

with Petro or who paid an early termination fee to Petro to cancel their ceiling price agreement with Petro because charged the ceiling price for oil deliveries even though the average market price for home heating oil in that region on the day of delivery had fluctuated downward. "Persons" includes individuals as well as profit and not-for-profit corporations, partnerships, limited liability companies, limited liability partnerships, joint ventures, sole proprietorships, associations, firms, trusts or other business or governmental entities.

(d)   Subclass consisting of all members of the Class who reside in New York State who paid an early termination fee to Petro to switch from a fixed price agreement to a ceiling price agreement with Petro or who paid an early termination fee to Petro to cancel their ceiling price agreement with Petro because charged the ceiling price for oil deliveries even though the average market price for home heating oil in that region on the day of delivery had fluctuated downward. "Persons" includes individuals as well as profit and not-for-profit corporations, partnerships, limited liability companies, limited liability partnerships, joint ventures, sole proprietorships, associations, firms, trusts or other business or governmental entities.

37.   Excluded from the "Class" and "Sub-classes" are: (i) Defendants, any entity in which Defendants have a controlling interest or which has a controlling interest in Defendants, and Defendants' legal representatives, predecessors, successors and assigns; (ii) Defendants' employees, officers, directors, agents, and representatives and their family members; (iii) the Judge and staff to whom this case is assigned, and any member of the Judge's immediate family; (iv) any person who has an action for damages for personal injury or death or property damage against Defendants.

38.   Plaintiff reserves the right to amend the Class definition if discovery and further investigation reveal the Class should be expanded or otherwise modified.

39.   This action has been brought and may properly be maintained as a class action, pursuant to Federal Rule of Civil Procedure 23(b)(3), because there is a well-defined community of interest in the litigation in which common issues predominate and the proposed class is easily ascertainable:

a)   <u>Numerosity</u>.  Petro entered into ceiling price agreements with oil heating customers across the Eastern United States. Plaintiff is informed and believes that the proposed putative Class is made-up of at least several thousand Petro customers.

b)   <u>Common Issues Predominate</u>.  Common questions of law and fact exist as to all members of the Class and predominate over any questions which affect only individual

members of the Class. The terms of the ceiling price agreements are virtually all the same and do not differ in any manner that is relevant to Plaintiff's allegations, and the damage and harm caused thereby. There is a well-defined community of interest in the questions of law and fact involved and that affect Petro consumers who entered into ceiling price agreements. These questions of law and fact predominate over questions that affect only individual class members.

The common questions of law and fact include, without limitation:

(1)   Whether Petro has a policy or practice of refusing to honor its promise to adjust oil price rates downward in accordance with market fluctuations for customers opting for the Petro ceiling plan;

(2)   Whether Petro made false or misleading statements, or representations of fact;

(3)   Whether Petro's acts actually deceived or had a tendency to deceive its customers;

(4)   Whether Petro violated New York's General Business Law §349;

(5)   Whether Petro violated New York's General Business Law §350;

(6)   Whether class members are entitled to injunctive relief compelling Defendants to adjust prices downward as oil prices fall for those customers opting for the Petro Ceiling Plan;

(7)  Whether Class Members are entitled to actual damages and if so, what is the appropriate amount;

(8)  Whether Defendants deliberately misrepresented or failed to disclose material facts to Plaintiff and the Class Members;

(9)  Whether Petro violated other states consumer protection law by failing to adjust prices downward in accordance with market fluctuations for customers of those states opting for the Petro ceiling plan;

(10) Whether Petro violated other states false advertising laws;

(11) Whether Petro has been unjustly enriched at the expense of Plaintiff and the other Class Members.

These questions of law and fact predominate over questions that affect only individual Class members and there is a well-defined community of interest in the questions of law and fact involved and that affect the Class.

c)  <u>Typicality</u>.  Plaintiff's claims are typical of the claims of the Class members in that Plaintiff and the Class members have entered into the same ceiling price agreements about which Defendants repeatedly made the same uniform misrepresentations of fact and material omissions. Therefore, the claims of Plaintiff are and will be typical of Class members.

d)  <u>The Class is Ascertainable</u>.  Plaintiff has adequately and objectively defined the Class, as detailed above,

so the Court and Class members will be able to use the definition to determine Class membership.

e) <u>Adequacy</u>.   Plaintiff will fairly and adequately represent the interests of all Class members. Plaintiff has entered into a Petro ceiling price agreement and suffered injury by virtue of Petro failing and refusing to reduce the per gallon price of heating oil downward as heating prices have plummeted during the contract term. Plaintiff is an adequate representative of the Class as he has no interests which are adverse to the interests of absent Class members. Plaintiff has retained counsel with substantial experience and success in the prosecution of complex consumer protection class action litigation.

f) <u>Superiority</u>.   A class action is superior to other available means for the fair and efficient adjudication of this controversy.  Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of effort and expense that numerous individual actions would engender.  The disposition of their claims in this case and as part of a single class action lawsuit, rather than hundreds of individual lawsuits, will benefit the parties and greatly  reduce the aggregate judicial resources that would be spent if this matter were handled as hundreds of separate lawsuits. Furthermore, given the extraordinary expenses and burden in conducting the discovery, retention and analysis

by specialized experts and presentation of evidence, the burden of individual litigation would make it extremely difficult, if not impossible for individual members of the Class to redress the wrongs asserted herein, while an important public interest will be served by addressing the matter as a class action. Moreover, separate prosecution by thousands of individual members of the Class would likely establish inconsistent standards of conduct for the Defendants and result in the impairment of, and potential harm to, Class members' rights and the disposition of their interests through actions to which they were not parties.   Plaintiff knows of no difficulty that will be encountered in the management of this litigation which would preclude its maintenance as a class action.

## VII. <u>CAUSES OF ACTION</u>

### <u>FIRST CAUSE OF ACTION</u>

(Violations of New York General Business Law §349)

40.   Plaintiff repeats and re-alleges all prior paragraphs and incorporate them as if fully set forth herein.

41.  With regards to Plaintiff and other members of the Class who had oil delivered in New York, Defendants' conduct as alleged herein constitutes deceptive acts and practices in the conduct of a business, trade, or commerce or in the furnishing of a service in the State of New York in violation of N.Y. Gen. Bus. Law §349, *et seq.*

42.  Defendants' conduct as alleged herein was directed at consumers such as Plaintiff, and members of the Class, was consumer oriented misconduct that was misleading in a material respect to a reasonable consumer acting reasonably under the circumstances, and had a broad impact on consumers at large.

43.  As a direct and proximate result of Defendants' conduct as alleged herein, consumers such as Plaintiff and members of the Class suffered actual damages in excess of $50 and including economic and financial losses.  In particular, as a result of Defendants' deceptive acts, Plaintiff and the Class members have been treated as though they opted for a "fixed price plan" for delivery of their heating oil instead of a "ceiling price plan" and have been deprived of the benefit of the downward fluctuations in the price of oil over the terms of their contracts.  Had Defendants disclosed that Petro would not

adjust the price of heating oil downward for ceiling pricing plan customers even when the price of heating oil was plummeting, Plaintiff and the Class members would have behaved differently, by either not switching from a Petro fixed price plan to a Petro ceiling price plan and incurring significant early termination costs, or by not committing to enter into a year-long agreement for the automatic delivery of heating oil by Petro at all. Defendant's deceptive acts and practices as alleged herein were willful and knowing.

44.  Plaintiff and members of the Class are entitled to injunctive relief and should be awarded actual damages which should be trebled within the discretion of the Court.

45.  Pursuant to N.Y. Gen. Bus. Law §349(h), Plaintiff Donnenfeld and his counsel will seek reasonable attorneys' fees, to be awarded within the discretion of the Court.

### SECOND CAUSE OF ACTION
**(Violations of New York General Business Law §349)**

46.  Plaintiff repeats and re-alleges all prior paragraphs and incorporate them as if fully set forth herein.

47.  With regards to New York consumers, Defendants' acts, practices and advertisement are of a recurring nature and were directed at consumers.

48.  With regards to New York consumers, Defendants' acts, practices and advertisements are materially deceptive and misleading.

49.  With regards to New York consumers, Plaintiff and the class were injured as a result of defendant's deceptive acts, practices and advertisements.

### THIRD CAUSE OF ACTION
(Violations of New York's General Business Law §350)

50.  Plaintiff repeats and re-alleges all prior paragraphs and incorporate them as if fully set forth herein.

51.  With regards to New York consumers, Defendants' advertisements were false and misleading in a material respect.

52.  With regards to New York consumers, Plaintiff and the class have been aggrieved by defendant's false advertising.

### FOURTH CAUSE OF ACTION
(Fraudulent Concealment/Nondisclosure)

53.  Plaintiff repeats and re-alleges all prior paragraphs and incorporate them as if fully set forth herein.

54.  Defendants knew or were reckless in not knowing at the time Plaintiff and the other class members were offered a ceiling plan agreement that Petro would not  reduce the per-gallon price of heating oil that Plaintiff and the class members were locked into purchasing for a year even when the price of oil fell.

55.  Defendants fraudulently concealed from and/or intentionally failed to disclose to Plaintiff, the Class, and the Sub-Class that they were committing to purchase heating oil from Petro for a year (and for the Sub-class incurring a substantial early termination fee) by switching to a ceiling price plan which offered no benefit over the fixed price plan.

56.  Defendants had exclusive knowledge of this undisclosed policy or practice at the time of sale.  Plaintiff and Class Members, in the exercise of reasonable diligence, could not have

discovered this policy or practice independently prior to entering into the agreement.

57. Defendants had the capacity to, and did, deceive plaintiff and the class members into believing that they were committing to a year-long automatic purchase plan which offered them the possibility of a reduced price for oil as prices fell.

58. The facts concealed and/or not disclosed by Defendants to Plaintiff and the Class are material facts in that a reasonable person would have considered them important in deciding whether or not to enter into a ceiling price agreement with Petro.

59. If the facts concealed and/or not disclosed by Defendants to Plaintiff and the proposed Class and Sub-Class had been disclosed to Plaintiff, the Plaintiff would not have paid an early termination fee or entered into a ceiling price plan with Petro.

60. Defendants had a duty to disclose these facts at the time of contracting by virtue of the fact that consumers would reasonably expect such disclosures.

61. Defendants intentionally concealed and/or failed to disclose the pattern or policy of not reducing the price per gallon of ceiling price plan members as oil prices dropped for the purpose of inducing Plaintiff and the Class to act thereon.

62. Plaintiff and the Class justifiably acted or relied upon the concealed and/or non-disclosed facts to their detriment, as evidenced by their entering into ceiling price plan agreements and committing to a year of automatic deliveries by Petro.

63. As a direct and proximate cause of Defendants' misconduct, Plaintiff and Class Members and Sub-Class Members have suffered actual damages in that they committed to a year of deliveries at prices that will not be reduced even though oil prices have fallen and other oil delivery providers have reduced their prices, and for Sub-Class Members have paid an early termination fee for the privilege of being locked into a contract which provides no added benefit over their fixed price plan agreements.

64. Defendants conduct has been and is wanton and/or reckless and/or shows a reckless indifference to the interests of others.

65. Defendants have acted with malice by engaging in conduct that was and is intended by Defendants to cause injury to the Plaintiff and the Class.

66. Defendants have committed fraud through its concealment of material facts known to Defendants with the intent to cause injury to the Plaintiff and the Class and Sub-Class.

### FIFTH CAUSE OF ACTION
(Breach of Contract)

67. Plaintiff repeats and re-alleges all prior paragraphs and incorporate them as if fully set forth herein.

68. The terms of the Petro ceiling price agreements provides that "your actual delivered price, which includes the cost of the ceiling protection, will vary based on market conditions, including but not limited to, product availability, wholesale cost and other factors, but will not exceed the Ceiling Price during the Pricing Period."

69.  Petro has breached this contractual provision by failing and refusing to vary the delivered price as market conditions have plummeted.

70.  Plaintiff and Members of the Plaintiff Class and Sub-class have suffered damage as a result of Defendants' breach of contract.

**SIXTH CAUSE OF ACTION**
(Breach of Implied Covenant of
Good Faith and Fair Dealing)

71.  Plaintiff repeats and re-alleges all prior paragraphs and incorporate them as if fully set forth herein.

72.   In every contract there is an implied covenant of good faith and fair dealing.

72.  The ceiling price plan agreement with a year-long commitment for automatic delivery contains this implied covenant.

73.  Defendants breached their contractual obligation of good faith and fair dealing by failing to reduce the price per gallon of heating oil it delivers to ceiling price plan customers even when prices fall which deprives plaintiff and class members of the benefit of their bargain.

74.  As a direct and proximate result of defendants' breach of the implied covenant of good faith and fair dealing, plaintiff and the Class have suffered and continues to suffer irreparable harm.

## SEVENTH CAUSE OF ACTION
### (Unjust Enrichment)

75.   Plaintiff repeats and re-alleges all prior paragraphs and incorporate them as if fully set forth herein.

76.   Defendants were enriched by their deceptive acts.

77.   The enrichment was at the expense of Plaintiff and the Class and Sub-Class.

78.   The circumstances are such that equity and good conscience requires that Defendants make restitution.

79.   Defendants have failed to make restitution.

80.   As a result, Plaintiff and the Class and Sub-Class have been damaged.

## EIGHTH CAUSE OF ACTION
### (Violation of Various Other States
### Consumer Protection Laws)

81.   Plaintiff repeats and re-alleges all prior paragraphs and incorporate them as if fully set forth herein.

82.   Defendants had a statutory duty to refrain from unfair and deceptive trade acts or practices in its provision of services to Plaintiff.

83.   The actions and failures to act of Defendants constitutes acts, uses or employment by defendants of unconscionable and/or unfair practices, deception, fraud, false pretenses, false promises, misrepresentations, or the concealment, suppression, or omission of material fact in connection with its advertisement about and  implementation of the ceiling price plan agreements entered into by the Plaintiff,

the Putative Class and Sub-class within the meaning of various state consumer protection acts.

84.   Defendants had a statutory duty to refrain from unfair and/or deceptive trade acts or practices in how they advertised and implemented the ceiling price plan agreements entered into by Plaintiff and Putative Class.

85. The violations of the various state consumer protection acts - Alabama: the Alabama Deceptive Trade Practices Act (Ala. Code §8-19-1 et seq.); Alaska: Alaska Unfair Trade Practices and Consumer Protection Act (Alaska Stat. §45.50.471 et. seq.); Arizona: the Arizona Consumer Fraud Statute (Ariz. Rev. Stat. Ann. §44-1521 eq. seq.); Arkansas: the Arkansas Deceptive Trade Practices Act. (Ark. Code Ann. §4-88-101 et. seq.); California: (Cal. Civ. Code §1750, seq.; Cal. Bus. & Prof. Code. §17200 et seq.); Colorado: the Colorado Consumer Protection Act. (Colo. Rec. Stat. §6-1-101 et seq.); Connecticut: the Connecticut Unfair Trade Practices Act (Conn. Gen. Stat. §42-110a et seq.); Washington, D.C.: the Consumer Protection Procedures Act. (D.C. Code Ann. §28-3901 et seq.); Florida: the Florida Deceptive and Unfair Trade Practices Act (Fla. Stat. Ann. §501.201 et. seq. (West)) and the Florida False Advertising Statutes (Fla. Stat. Ann. §817.40 et seq. (West)); Georgia: Uniform Deceptive Trade Practices Act (Ga. Code Ann. §10-1-370 et seq.); the Fair Business Practices Act (Ga. Code Ann. §10-1-1420 et seq.); Hawaii: The Hawaii Federal Trade Commission Act (Hawaii Rev. Stat. §481A et seq.) and Uniform

Deceptive Trade Practices Act (Hawaii Rev. Stat. §481A et. seq.); Idaho: the Idaho Consumer Protection Act (Idaho Code §48-601 et seq); Illinois: the Uniform Deceptive Trade Practices Act (815 ILCS §§510/1 et seq.) and Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILC §505 et seq.); Indiana: the Deceptive Consumer Sales Act (Ind. Code Ann. §24-5-0.5-1 et seq. (Burns)); Iowa: the Iowa Consumer Fraud Act (Iowa Code Ann. §714.16 (West)); Kansas: the Kansas Consumer Protection Act (Kan. Stat. Ann. §50-623 et seq.); Kentucky: the Consumer Protection Act (Ky. Rev. Stat. §367.110 et seq.); Louisiana: the Unfair Trade Practices and Consumer Protection Law (La. Rev. Stat. Ann. §51:1401 (West)); Maine: the Maine Unfair Trade Practices Act (Me. Rev. Stat. Tit. 5 §206 et seq.) and the Uniform Deceptive Trade Practices Act (Md. Com. Law Ann. §§13-101 et seq., 14-101 et seq.); Massachusetts: the Consumer Protection Act (Mass. Gen. Laws Ann. Ch. 93A); Michigan: the Michigan Consumer Protection Act (Mich. Comp. Laws Ann. §445.901 et seq.) and the Michigan Pricing and Advertising Act (Mich. Comp. Laws. Ann. §445.351 et seq.); Minnesota: the Consumer Fraud Act. (Minn. Stat. Ann. §325 F. 69); the False Statement in Advertisement Statute (Minn. Stat. Ann. §325 F. 67); the Uniform Deceptive Trade Practices Act (Minn. Stat. Ann. §325D.44); and the Unlawful Trade Practices Act (Minn. Stat. Ann. §325D.13); Mississippi: the Consumer Protection Act (Miss. Code Ann. §75-24-1 et seq) and the False Advertising Statutes (Miss. Code Ann. §97-23-3); Missouri: the Missouri Merchandising

Practices Act (Mo. Rev. Stat. §407.010 et seq.); Montana: the Montana Unfair Trade Practices and Consumer Protection Act (Mont. Code Ann. §30-14-01 et seq.) and the Statutory Deceit Statute (Mont. Code Ann. §27-1-712); Nebraska: the Nebraska Consumer Protection Act (Neb. Rev. Stat. §59-1601 et seq.) and the Nebraska Uniform Deceptive Trade Practices Act. (Neb. Rev. Stat. §87-301 et seq.); Nevada: the Deceptive Trade Statues (Nev. Rev. Stat. §§598.0903 et seq., 41.600 et seq.) New Hampshire: the Regulation of Business Practices for Consumer Protection (N.H. Rev. Stat. Ann. §358-A:1 et seq.) New Mexico: New Mexico Unfair Practices Act (N.M. Stat. Ann. §57-12-1 et seq.); New York: New York Consumer Protection Act (N.U. Gen. Bus. Law. §§349, 350 (Consol.)); North Carolina: North Carolina Unfair and Deceptive Trade Practices Act (N.C. Gen. Stat. §75-1.1 et seq.); North Dakota: Deceptive Act or Practices Statutes (N.D. Gen. Stat. §51-15-01 et seq.); Ohio: Ohio Consumer Sales Practices Act (Ohio Rev. Code Ann. §1345.01 et seq. (Baldwin)); Oklahoma: Oklahoma Consumer Protection Act (Okla. Stat. Ann. Tit. 15, §751 et seq. (West)) and the Oklahoma Deceptive Trade Practices Act (Okla. Stat. Ann. Tit. 78, §51 et seq. (West)); Oregon: the Unlawful Trade Practices Act (Or. Rev. Stat. §616.005 et seq.); Pennsylvania: Unfair Trade Practices Act and Consumer Law (Pa. Stat. Ann. Tit. 73 §201-1 et seq. (Purdon)); Rhode Island: Consumer Protection Act (R.I. Gen. Law §6-13.1-1 et seq.); South Carolina: South Carolina Unfair Trade Practices Act (S.C. Code Ann. §39-5-10 et seq.); South Dakota Deceptive

Trade Practices and Consumer Protection Law (S.D. Codified Laws Ann. §37-24-1 et seq.); **Tennessee**: Tennessee Consumer Protection Act (Tenn. Code Ann. §47-18-101 et seq.); **Texas**: Texas Deceptive Trade Practices Act (Tex. Bus. & Com. Code Ann. §17.41 et seq. (Vernon)); **Utah**: Utah Consumer Sales Practices act (Utah Code Ann. §13-11a-1 et seq.): **Vermont**: Vermont Consumer Fraud Statute (Vt. Stat. Ann. Tit. 9, §2451 et. seq.); **Virginia**: Virginia Consumer Protection Act (Va. Code 59.1-196 et seq.); **Washington**: Washington Consumer Protection Act (Wash. Rec. Code Ann. §19.86 et seq.) **West Virginia**: West Virginia Consumer Credit and Protection Act (W. Va. Code §46A-6-101 et seq.) **Wisconsin**: Wisconsin Fraudulent Representations Act (Wis. Stat. Ann. §100.18 et seq. (West)); **Wyoming**: Consumer Protection Act (Wyo. Stat. §40-12-101 et seq.); have directly, foreseeably and proximately caused damages to Plaintiff and the Putative Class and Sub-class in amounts yet to be determined.

86. Defendants' actions are outrageous due to their reckless indifference to the rights of Plaintiff and the Putative Class and Sub-class.

## VIII. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment against Defendants for the following:

1. An order certifying Plaintiff's claims as a class action, appointing M. Norman Donnenfeld as representative Plaintiff and appointing their counsel to be counsel for the Class and Sub-Class;

2.   A constructive trust on and restitution of all amounts obtained by Defendants as a result of its violation of the statutory claims plead above, and the Defendants' misconduct, together with interest thereon from the date of payment, to the victims of such violations;

3.   All recoverable compensatory, punitive, and other damages sustained by Plaintiff and Class and Sub-Class members;

4.   Actual and/or statutory damages for injuries suffered by Plaintiff and Class members in the maximum amount permitted by applicable law;

5.   An injunction (1) enjoining Defendants' wrongful, unlawful, fraudulent, deceptive, and unfair conduct as set forth above; (2) directing Defendant to engage in a corrective notice campaign; and (3) directing Defendant to refund to Plaintiff and Class Members the difference between what they paid per gallon and what they should have paid had the ceiling price plan been properly implemented, and additionally as to  Sub-Class members the amount paid in  early termination fees for the privilege of switching to the ceiling price plans;

6.   Statutory pre-judgment and post-judgment interest on any amounts;

7.   Payment of reasonable attorneys' fees and costs as may be allowable under applicable law; and

8.   Such other relief as the Court may deem just and proper.

## IX.   DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all causes of action so triable.


Dated: April 18, 2017          By:*/s/ Diane E. Sammons*
                                   DIANE E. SAMMONS
                                   BRUCE H. NAGEL (to be
                                   admitted Pro Hac Vice)
                                   RANDEE M. MATLOFF (to be
                                   admitted Pro Hac Vice)
                                   NAGEL RICE, LLP
                                   230 Park Avenue
                                   New York, New York 10169
                                   dsammons@nagelrice.com
                                   bnagel@nagelrice.com
                                   rmatloff@nagelrice.com