M. NORMAN DONNENFELD, ON BEHALF OF HIMSELF AND ALL OTHER PERSONS SIMILARLY SITUATED,

Plaintiffs,

VERSUS

PETRO, INC. DOING BUSINESS AS PETRO HOME SERVICES,

Defendant.
_____

**MEMORANDUM AND ORDER**
September 12, 2018
_____

JOSEPH F. BIANCO, District Judge:

Plaintiff M. Norman Donnenfeld ("Donnenfeld" or "plaintiff") brings this putative class action against defendant Petro, Inc. ("Petro" or "defendant"), a home heating oil provider, for breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, fraudulent inducement, and violations of New York's General Business Law and other state consumer protection laws. Presently before the Court is Petro's motion to dismiss the First Amended Class Action Complaint in its entirety. For the reasons set forth below, the Court grants the motion as to plaintiff's claims for breach of the covenant of good faith and fair dealing and fraudulent inducement, but otherwise denies it. The Court will grant plaintiff leave to re-plead the fraudulent inducement claim.

I. BACKGROUND

A. Facts

The Court takes the following facts from the First Amended Class Action Complaint. (ECF No. 20.) The Court assumes these facts to be true in deciding the motion to dismiss, and construes them in the light most favorable to plaintiff, the non-moving party.

Petro is a home heating oil provider that operates in several states, including New York. (Am. Compl. ¶¶ 3, 16, 21-23.) Petro offers three pricing plans to its home heating oil customers: variable, ceiling, and fixed. (*Id.* ¶¶ 4, 24.) These pricing plans are described on Petro's website as follows:

Variable Plan

The Variable Plan has an attractive rate that fluctuates up and down with market conditions. There are no price

protective cost or termination fees associated with this plan.

Fixed Plan

Our Fixed Plan requires a 1-year commitment to Petro. The oil price remains the same for every delivery, for every gallon throughout the year, regardless of market conditions. Petro pre-purchases all of your oil and assumes all risk, so if you terminate your account prior to the expiration of your contract, an early termination fee of $599.00 will be assessed.

The Petro Ceiling Plan

Many customers feel this plan is a better option than the fixed price plan as it gives you a limit on how high your price can go and hopefully take advantage of lower prices in the future. The price will trend up or down based on market conditions at the time each delivery is made but will never exceed a set limit. A 1-year commitment to Petro is required for this plan. Similar to the fixed plan, Petro protects the cost of your oil and assumes all risk, so if you terminate your account prior to the expiration of your contract, an early termination fee of $399.00 will be assessed.

(*Id.* ¶ 4.)

On August 7, 2013, Donnenfeld entered into a fixed price Retail Fuel Delivery and Services Agreement with Petro ("the Fixed Price Contract"). (*Id.* ¶ 27, Ex. A.) Under that contract, Petro agreed to deliver home heating oil to Donnenfeld at a fixed price of $3.649 per gallon for the approximately one-year period from August 7, 2013 to August 31, 2014. (*Id.* Ex. A at 1.) In return, Donnenfeld agreed to obtain home heating oil exclusively from Petro during that period. (*Id.*) The contract provided that, if Donnenfeld's account was "cancelled for any reason" during the one-year period, he would "be charged a $599.00 early termination fee." (*Id.*)

In connection with entering into the Fixed Price Contract, Donnenfeld received, among other documents, Petro's Terms and Conditions. (*Id.* at 3.) Those Terms and Conditions included a "Limits of Liability" provision, which provided that "[a]ny and all actions, whether based in contract or tort, whether for personal injury or property damage, and whether brought by buyer or buyer's insurance company, must be commenced within one year of the cause of action or shall be barred as a matter of law." (*Id.*)

On July 30, 2014, Donnenfeld continued his Fixed Price Contract for another year. (*Id.* ¶ 28.) That agreement was memorialized in a form letter to Donnenfeld from Mike Perna, the President and General Manager of Petro's Plainview, New York office. (*Id.* Ex. B.) The phrase "A note of thanks for renewing your contract with Petro" appeared at the top of the letter, and the first sentence read, "Thank you so much for renewing your heating oil agreement with Petro!" (*Id.*) The letter provided that, for the approximately one-year period from September 1, 2014 to August 31, 2015, Petro would deliver home heating oil to Donnenfeld at a $3.699 per gallon fixed price. (*Id.*) It further provided that Donnenfeld agreed to obtain home heating oil exclusively from Petro during that period. (*Id.*) The letter also stated that, if Donnenfeld's account was "cancelled for any reason" during the one-year period, he would be charged a $599.00 early termination fee. (*Id.*)

Donnenfeld alleges that heating oil prices dropped significantly shortly after he agreed to continue his Fixed Price Contract with Petro. (*Id.* ¶ 29.) Based on Petro's

2

representations that, under their ceiling plan, the price he paid for heating oil would be based on market conditions, Donnenfeld determined that he would save money by entering into a ceiling price contract. (*Id.*)

Accordingly, in December 2014, several months before his current contract was due to expire, Donnenfeld called Mike Perna to change to a ceiling price plan. (*Id.*) To make that change, Petro charged Donnenfeld—and Donnenfeld paid—a $300 early termination fee. (*Id.* ¶ 29.) Donnenfeld then received a form letter from Mike Perna "confirm[ing] [the] phone conversation" and "outlin[ing] the terms of [the] ceiling price agreement." (*Id.* Ex. C (the "Ceiling Price Contract").) As with the previous letter, the phrase "A note of thanks for renewing your contract with Petro" appeared at the top of this letter, and the first sentence again read, "Thank you so much for renewing your heating oil agreement with Petro!" (*Id.*) The letter stated that, for the approximately one-year period from December 5, 2014 to December 31, 2015, Petro would deliver home heating oil to Donnenfeld at a price that would "not exceed $2.899 per gallon," but that Donnenfeld's "actual delivered price . . . w[ould] vary based on market conditions, including but not limited to, product availability, wholesale cost and other factors." (*Id.*) Like the previous contracts, the letter provided that Donnenfeld agreed to obtain home heating oil exclusively from Petro during the relevant one-year period. (*Id.*) Finally, the letter stated that, "with [Donnenfeld's] permission, [Petro] recorded the conversation detailing the terms of this Ceiling Price agreement, and w[ould] retain a copy of that recording for [Donnenfeld's] protection." (*Id.*)

Donnenfeld alleges that, despite a steady decline in oil prices throughout the term of his Ceiling Price Contract, his "price per gallon did not budge after the first two months." (*Id.* ¶ 39.) He alleges that "Petro has an unstated policy or practice of unilaterally and without justification, not reducing the per gallon price to customers who have entered into a Petro ceiling plan agreement, even as oil prices fall, and instead, charge Petro ceiling plan customers the top of the ceiling price per gallon on a regular basis." (*Id.* ¶ 6.)

B. Procedural History

Donnenfeld originally filed this lawsuit against Petro on February 18, 2016, in the United States District Court for the District of New Jersey. On May 9, 2016, Petro moved to dismiss the complaint for lack of personal jurisdiction and for failure to state a claim. In opposing the motion, Donnenfeld argued that, if the court found personal jurisdiction over Petro lacking, it should transfer the action to the United States District Court for the Eastern District of New York. Donnenfeld also requested leave to amend the complaint if the court determined that his pleadings were otherwise deficient. Petro argued in its reply that the interests of justice favored dismissal rather than transfer, and that Donnenfeld had failed to identify any special circumstances warranting transfer rather than dismissal.

On March 24, 2017, the district court dismissed plaintiff's complaint for lack of personal jurisdiction over Petro and, alternatively, for failure to state a claim. *See generally Donnenfeld v. Petro Home Servs.*, Civil Action No. 16-882, 2017 WL 1250992 (D.N.J. Mar. 24, 2017). The court declined to transfer the case to the Eastern District of New York, concluding that Donnenfeld had not established that the case was filed in the wrong venue or "address[ed] any of the personal or public interest factors that a court must consider when deciding whether to transfer a case." *Id.* at *4 n.2. The court did, however, grant Donnenfeld leave to amend. *Id.* at *6.

Rather than submit an amended complaint in the District of New Jersey, Donnenfeld filed a complaint in this Court on April 18, 2017. (ECF No. 1.) On July 31, 2017, Petro moved to dismiss. (ECF No. 17.) In response, Donnenfeld filed the First Amended Class Action Complaint. (ECF No. 20.) On September 15, 2017, Petro moved to dismiss the First Amended Class Action Complaint. (ECF No. 23.) Donnenfeld opposed the motion on October 20, 2017. (ECF No. 26.) Petro filed a reply in further support of its motion on November 10, 2017. (ECF No. 27.) The Court heard oral argument on January 18, 2018. On January 22, 2018, Donnenfeld filed a letter supplementing his opposition to the motion to dismiss. (ECF No. 31.) Petro submitted a response to that letter on January 25, 2018. (ECF No. 32.)

The Court has fully considered the parties' submissions and arguments.

II. STANDARD OF REVIEW

In reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006); *Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 100 (2d Cir. 2005). "In order to survive a motion to dismiss under Rule 12(b)(6), a complaint must allege a plausible set of facts sufficient 'to raise a right to relief above the speculative level.'" *Operating Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 91 (2d Cir. 2010) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). This standard does not require "heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

The Supreme Court clarified the appropriate pleading standard in *Ashcroft v. Iqbal*, setting forth a two-pronged approach for deciding motions to dismiss. 556 U.S. 662, 678-80 (2009). Specifically, the Supreme Court instructed district courts to first "identify[] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679 (explaining that though "legal conclusions can provide the framework of a complaint, they must be supported by factual allegations"). Second, if a complaint contains "well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.*

Additionally, when a case involves allegations of fraud or mistake, Federal Rule of Civil Procedure 9(b) requires those claims to be pleaded with particularity. Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."). Rule 9(b) "serves to provide a defendant with fair notice of a plaintiff's claim, safeguard his reputation from improvident charges of wrongdoing, and protect him against strike suits." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (citing *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004)). To comply with Rule 9(b)'s specificity requirements, plaintiffs must "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004) (quoting *Harsco Corp. v. Segui*, 91 F.3d 337, 347 (2d Cir. 1996)).

The Court notes that, in adjudicating this motion to dismiss, it may consider:

> (1) facts alleged in the complaint and documents attached to it or incorporated in it by reference, (2) documents "integral" to the complaint and relied upon in it, even if not attached or incorporated by reference, (3) documents or information contained in defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint, (4) public disclosure documents required by law to be, and that have been, filed with the Securities and Exchange Commission, and (5) facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence.

*In re Merrill Lynch & Co.*, 273 F. Supp. 2d 351, 356-57 (S.D.N.Y. 2003), *aff'd sub nom. Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005).

### III. DISCUSSION

A. Contractual Statute of Limitations

Petro argues that the complaint should be dismissed as untimely under the one-year statute of limitations contained in the Terms and Conditions that were enclosed with Donnenfeld's initial Fixed Price Contract. As noted above, the "Limits of Liability" provision contained in those Terms and Conditions provided that "[a]ny and all actions, whether based in contract or tort, whether for personal injury or property damage, and whether brought by buyer or buyer's insurance company, must be commenced within one year of the cause of action or shall be barred as a matter of law." (Am. Compl. Ex. A at 4.)

The parties dispute whether the Terms and Conditions, which were provided to Donnenfeld only with his Fixed Price Contract, apply to the Ceiling Price Contract. Petro relies on language in the Terms and Conditions that defines the parties' "Agreement" to include "the Price Plan, these terms and conditions and *any agreed renewal terms*." (*Id.* (emphasis added).) It asserts that the Ceiling Price Contract was a renewal of the Fixed Price Contract, and that the Terms and Conditions therefore continued to apply. To support the assertion that the Ceiling Price Contract was a renewal, Petro points to the language in the form letter from Mike Perna thanking Donnenfeld for "renewing [his] contract with Petro." (*Id.* Ex. C.)[1] For his part, Donnenfeld argues that the Ceiling Price Contract was an entirely new contract, and that the Fixed Price Contract was terminated. Because the Terms and Conditions were not provided to Donnenfeld in connection with the Ceiling Price Contract, Donnenfeld argues they do not apply to that contract. As explained below, the Court concludes that these issues cannot be decided on this motion to dismiss.

Under New York law, "a novation is a new contract replacing and extinguishing a prior contract." *Gem Glob. Yield Fund, Ltd. v. Surgilight, Inc.*, No. 04-CV-4451 (KMK), 2006 WL 2389345, at *15 (S.D.N.Y. Aug.

---

[1] The term "renewal" is not defined in any of the written agreements. To the extent Petro relies on the legal meaning of that term, courts have defined that term differently than Petro does here. For example, as one court explained, "[r]enewal normally involves 'a continuation of the relationship on essentially the same terms and conditions as the original contract.'" *D.S. Am. (E.), Inc. v. Chromagrafx Imaging Sys., Inc.*, 873 F. Supp. 786, 794 (E.D.N.Y. 1995) (quoting *Williams Petroleum Co. v. Midland Coops., Inc.*, 679 F.2d 815, 819 (10th Cir. 1982)). Here, the Ceiling Price Contract involved substantially different terms from the Fixed Price Contract. Thus, any legal meaning of the word "renewal" does not unambiguously support Petro's position.

17, 2006). "[I]t is well-established that whether a novation exists depends on the parties' intention." *D.S. Am. (E.), Inc. v. Chromagrafx Imaging Sys., Inc.*, 873 F. Supp. 786, 794 (E.D.N.Y. 1995) (collecting cases); *see also Auto Style Leasing Ltd. v. Evans*, No. 92 Civ. 6837 (CSH) (LB), 1995 WL 144812, at *8 (S.D.N.Y. Mar. 31, 1995) ("Whether the actions of the parties constitute a novation is determined by the 'intentions of the parties.'" (quoting *May Dep't Stores Co. v. Int'l Leasing Corp.*, 1 F.3d 138, 140 (2d Cir. 1993))). If the parties "have manifested their intent on the face of the document, the court can make this determination as a matter of law." *C3 Media & Mktg. Grp., LLC v. Firstgate Internet, Inc.*, 419 F. Supp. 2d 419, 434 (S.D.N.Y. 2005). But "[w]hen what the parties intended cannot be 'definitely and precisely gleaned' from a reading of the contract, they should be afforded an opportunity to present extrinsic evidence to establish their intent." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993).

Relatedly, "where a contract is existing and valid but incomplete," extrinsic evidence is admissible to complete the writing. *See, e.g.*, *Coney Island Resorts, Inc. v. Giuliani*, 11 F. App'x 11, 13-14 (2d Cir. 2001). Whether a contract is a complete turns on the parties' intent. *E.g.*, *Gualandi v. Adams*, 385 F.3d 236, 241 (2d Cir. 2004) ("To conclude that the settlement agreement is an integrated contract . . . we would need to find that the parties intended the settlement agreement to constitute the complete and final expression of their agreement."); *Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 295 (2d Cir. 1999) ("A written contract is considered integrated when the parties intend it to constitute the complete and final expression of their agreement."). To determine that intent, courts examine various factors, including whether the document refers to an extrinsic oral agreement and whether it contains a merger clause. *E.g.*, *Trans-Pro Logistic Inc. v. Coby Elecs. Corp.*, No. 05 CV 1759 CLP, 2012 WL 526764, at *8 (E.D.N.Y. Feb. 16, 2012); *E.G.L. Gem Lab Ltd. v. Gem Quality Inst., Inc.*, 90 F. Supp. 2d 277, 303-04 (S.D.N.Y. 2000), *aff'd*, 4 F. App'x 81 (2d Cir. 2001).

Here, there is a sufficient basis for Donnenfeld to plausibly assert that the parties' intentions are not manifest on the face of the agreement. The terms of the Ceiling Price Contract are silent as to whether that agreement was intended to extinguish, supersede, substitute, modify, or have any other effect on the Fixed Price Contract. It also does not state that Petro's Terms and Conditions would continue to apply; nor does it incorporate any Terms and Conditions by reference. Petro makes much of this confirmation letter's use of the word "renewal" at the top of the letter and in its first sentence. The Court is not persuaded that that usage is necessarily conclusive evidence of the parties' intentions, particularly because the letter references an earlier telephone conversation and is a confirmation letter that Donnenfeld did not sign. Accordingly, the Court cannot ascertain the parties' intentions as a matter of law on this motion to dismiss, and the parties should be given the opportunity to present extrinsic evidence to establish intent. *See, e.g.*, *D.S. Am. (E.), Inc.*, 873 F. Supp. at 794 (denying motion to dismiss because parties' intention as to whether subsequent agreement acted as a novation could not be determined as a matter of law).

Moreover, construing the language most favorably to Donnenfeld, there is a plausible argument that the Ceiling Price Contract is incomplete. It does not contain a merger clause, and expressly refers to the telephone conversation between Donnenfeld and Mike Perna. Presumably, the recording of that conversation will illuminate the parties'

intentions as to the effect of the $300 early termination fee and the execution of the Ceiling Price Contract. It will also likely reveal any discussions about the terms and conditions that applied to the contract.

In short, Donnenfeld plausibly alleges that the Ceiling Price Contract replaced the Fixed Price Contract such that dismissal of the claims as untimely at this stage is unwarranted. Specifically, Donnenfeld alleges that he entered into the Fixed Price Contract with Petro in August 2013, which he renewed in July 2014. (Am. Compl. ¶¶ 27-28.) He further alleges that he paid a $300 fee to terminate the Fixed Price Contract before its expiration, and entered into a new contract with Petro—the Ceiling Price Contract. (*Id.* ¶ 29.) These allegations are sufficient, at the motion to dismiss stage, to plausibly allege that the Ceiling Price Contract extinguished the Fixed Price Contract. *See, e.g.*, *Schuster v. Dragone Classic Motor Cars, Inc.*, 98 F. Supp. 2d 441, 446 (S.D.N.Y. 2000); *City of Amsterdam v. Daniel Goldreyer, Ltd.*, 882 F. Supp. 1273, 1280 (E.D.N.Y. 1995).

Accordingly, for all of the foregoing reasons, Petro's motion to dismiss the claims as untimely is denied without prejudice to renewal after discovery.[2]

B. Breach of Contract

To state a claim for breach of contract under New York law, a complaint must allege four elements: "(1) the existence of an agreement, (2) adequate performance of the contract by plaintiff, (3) breach of the contract by defendant, and (4) damages."

*Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004). Petro moves to dismiss Donnenfeld's breach of contract claim for failure to plausibly allege the third element—that Petro breached the Ceiling Price Contract.

Donnenfeld's breach of contract claim centers on Petro's contractual representation that his "actual delivered price . . . w[ould] vary based on market conditions, including but not limited to, product availability, wholesale cost and other factors." (Am. Compl. Ex. C.) In short, Donnenfeld contends that Petro breached the Ceiling Price Contract by charging him prices that did not vary based on market conditions. (*See, e.g.*, *id.* ¶¶ 6, 9, 30, 92-96.) To support this contention, Donnenfeld alleges that, other than for the first two months of the contract,[3] Petro consistently charged him the $2.899 per gallon ceiling price for his heating oil throughout the contract's term. (*Id.* ¶ 30.) He further alleges that Petro did so despite a steady drop in crude oil prices during the relevant period (*e.g.*, *id.* ¶¶ 37-38), and despite the fact that Petro's "spot market price available to its customers as a function of market price was below plaintiff's ceiling price and below the price defendant continued to charge the plaintiff" (*id.* ¶ 34; *see also, e.g.*, *id.* ¶¶ 32, 43). Donnenfeld also alleges that Petro quoted his son a $2.35 per gallon ceiling price in early December 2015, but charged Donnenfeld his contractual $2.899 per gallon ceiling price that month. (*Id.* ¶ 31.) Finally, Donnenfeld alleges that his daughter, who was a party to a ceiling price agreement with a different home

---

[2] Donnenfeld also argues that the contractually shortened statute of limitations is unenforceable and, in any event, does not apply to these claims. He further argues that, even if the one-year limitations period does apply, it should be equitably tolled. Because the Court cannot determine on this motion whether the provision even applied to the Ceiling Price Contract, it does not reach these additional arguments at this time.

[3] Petro makes much of the allegation that it charged Donnenfeld less than the ceiling price for the first two months of the contract. That allegation, however, does not foreclose the claim that Petro breached the contract in those months or in the remaining months.

7

heating oil provider in the region, was charged steadily decreasing prices during the relevant period. (*Id.* ¶ 36.)

Petro asserts that these allegations fail to establish that Donnenfeld's delivered price did not vary based on "market conditions" including the factors identified in the Ceiling Price Contract as affecting those conditions—namely, "product availability, wholesale costs, and other factors." (Am. Compl. Ex. C.) The Court concludes, however, that these allegations are sufficient to state a plausible breach of contract claim that survives a motion to dismiss.

Several courts in this district and others have allowed breach of contract claims involving similar contractual language and supporting factual allegations to proceed past motions to dismiss. In *Oladapo v. Smart One Energy, LLC*, for example, the at-issue contract provided that the plaintiff's monthly gas prices would be determined by the defendant "at its sole discretion, in response to changing gas market conditions." No. 14 CV 7117-LTS, 2016 WL 344976, *1 (S.D.N.Y. Jan. 27, 2016). The plaintiff argued that the defendant breached the contract by charging prices unrelated to gas market conditions, as supported by the allegations that the gas rates charged to the plaintiff increased despite declines in gas prices in the marketplace. *Id.* at *2. The court denied a motion to dismiss the breach of contract claim. *Id.* at *3. It concluded that the contract was "susceptible, when read in the light most favorable to Plaintiff, to interpretation as an undertaking to set prices in a manner reflective of actual gas market prices," and that plaintiff's allegations were "sufficient, at the pleading stage, to support an inference of breach." *Id.*

Similarly, in *Yang Chen v. Hiko Energy, LLC*, the at-issue contract provided that the plaintiffs' monthly gas and electricity charges would reflect wholesale costs and other "market-related factors." No. 14 CV 1771 VB, 2014 WL 7389011, at *1 (S.D.N.Y. Dec. 29, 2014). The plaintiffs alleged that the defendant breached the contract by charging rates that did not reflect wholesale costs and "other market related factors," based on the alleged fact that the prices charged by the defendant were higher than a competitor's prices. *Id.* at *6. The court concluded that those allegations were sufficient to withstand a motion to dismiss. *Id.*

Finally, *Mirkin v. Viridian Energy, Inc.*, involved a contract that provided that the defendant would provide gas and electricity to the plaintiff "based on wholesale market conditions." No. 15-cv-1057, 2016 WL 3661106, at *3 (D. Conn. July 5, 2016). The plaintiff's breach of contract claim alleged that the defendant "did not actually base its rates on those conditions, as demonstrated by the failure of the charged rates to track wholesale market rates." *Id.* at *8. The court concluded that such allegations were sufficient to withstand a motion to dismiss. *Id.*[4]

The Court reaches the same conclusion here. Petro represented that Donnenfeld's monthly price would be "based on market conditions . . . including but not limited to, product availability, wholesale cost and other factors." (Am. Compl. Ex. C.) This

---

[4] Some courts have dismissed similar breach of contract claims. *See, e.g.*, *Windley v. Starion Energy, Inc.*, No. 14 cv 9053, 2016 WL 197503, at *3 (S.D.N.Y. Jan. 8, 2016). As explained in *Oladapo*, those cases involved contracts with "discretionary language alone or in combination with references to numerous factors other than market prices." 2016 WL 344976, at *1. Here, all of the factors listed in the Ceiling Price Contract are market-related. Donnenfeld's allegations that his prices did not vary with market prices are accordingly sufficient to state a claim for breach of contract.

language, when read in the light most favorable to Donnenfeld, can be readily interpreted as a promise that Donnenfeld's price would decline when market prices did. The allegations briefly detailed above are sufficient, at this stage, to plausibly allege a breach of that promise. Accordingly, Petro's motion to dismiss the breach of contract claim is denied.

C. Good Faith and Fair Dealing

Petro moves to dismiss Donnenfeld's claims for breach of the covenant of good faith and fair dealing as duplicative of his breach of contract claim.

Under New York law, a covenant of good faith and fair dealing is implied in every contract. *Payday Advance Plus, Inc. v. Findwhat.com, Inc.*, 478 F. Supp. 2d 496, 503 (S.D.N.Y. 2007). Accordingly, "a breach of the duty of good faith and fair dealing is considered a breach of contract," *Fishoff v. Coty Inc.*, 634 F.3d 647, 653 (2d Cir. 2011), and a complaint that pleads both claims "is redundant," *Jordan v. Verizon Corp.*, No. 08 CIV. 6414 (GEL), 2008 WL 5209989, at *7 (S.D.N.Y. Dec. 10, 2008); *see also Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002) (New York law "does not recognize a separate cause of action for a breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled."). An exception to this general rule exists when a plaintiff alleges "an implied duty that is consistent with the express contractual terms, but base[s] its implied covenant theory on allegations that are distinct from the factual predicate for its contract claims." *JPMorgan Chase Bank, N.A. v. IDW Grp., LLC*, No. 08 CIV 9116 (PGG), 2009 WL 321222, at *5 (S.D.N.Y. Feb. 9, 2009).

Here, the factual allegations supporting Donnenfeld's breach of contract claim are identical to those supporting his claim for breach of the covenant of good faith and fair dealing. Accordingly, Petro's motion to dismiss the claim for breach of the covenant of good faith and fair dealing is granted.

D. Unjust Enrichment

Petro also moves to dismiss the unjust enrichment claim as duplicative of the breach of contract claim.

Generally, an unjust enrichment claim is precluded if a valid and enforceable contract governs the subject matter of a dispute. *E.g.*, *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 587 (2d Cir. 2006). However, "a claim for unjust enrichment is not duplicative of a breach of contract claim where the plaintiff alleges that the contract[] w[as] induced by fraud" and is voidable, or is otherwise invalid. *E.g.*, *Tropical Sails Corp. v. Yext, Inc.*, No. 14 CIV. 7582 JFK, 2015 WL 2359098, at *7-8 (S.D.N.Y. May 18, 2015) (collecting cases); *see also Lefkowitz v. Reissman*, No. 12 CIV. 8703 RA, 2014 WL 925410, at *12 (S.D.N.Y. Mar. 7, 2014) ("Because . . . 'a factual issue' remains as to the fraudulent inducement claim, the contract governing the Second Blackriver Loan is potentially voidable. Plaintiff may therefore plead an unjust enrichment claim . . . solely as an alternative to the breach of contract claim." (quoting *Bridgeway Corp. v. Citibank, N.A.*, 132 F. Supp. 2d 297, 305 (S.D.N.Y.2001))).

Here, Donnenfeld has alleged that he was fraudulently induced to enter into the Ceiling Price Contract. Although, as discussed below, that claim is insufficiently pleaded, the Court is allowing Donnenfeld to amend the claim. Because the claim for fraudulent inducement has not been dismissed without leave to amend, the Court declines to dismiss the unjust enrichment claim at this time.

9

E. Fraudulent Inducement[5]

Petro moves to dismiss Donnenfeld's fraudulent inducement claim as duplicative of his breach of contract claim and for failure to satisfy Rule 9(b).

Generally, "a fraud claim may not be used as a means of restating what is, in substance, a claim for breach of contract." *Wall v. CSX Transp., Inc.*, 471 F.3d 410, 416 (2d Cir. 2006). However, New York law recognizes an independent claim for fraudulent inducement when the alleged misrepresentation concerns a matter collateral to the contract between the parties. *See id.* ("New York law specifically recognizes causes of action for fraud in the inducement when the misrepresentation is collateral to the contract it induced."); *Alpha Capital Anstalt v. Oxysure Sys., Inc.*, 252 F. Supp. 3d 332, 339 (S.D.N.Y. 2017) ("[F]raud in the inducement can be supported by a false statement of present fact, or by a false statement of future intent which concerns a matter collateral to a contract between the parties." (quoting *Int'l CableTel Inc. v. Le Groupe Videotron Ltee*, 978 F. Supp. 483, 491 (S.D.N.Y. 1997))). Conversely, a fraudulent inducement claim is duplicative of a contract claim when it "is premised upon an alleged breach of contractual duties and the supporting allegations do not concern representations which are collateral or extraneous to the terms of the parties' agreement." *Alpha Capital Anstalt*, 252 F. Supp. 3d at 339 (quoting *Vorcom Internet Servs., Inc. v. L & H Eng'g & Design LLC*, No. 12-CV-2049, 2013 WL 335717, at *4 (S.D.N.Y. Jan. 9, 2013)).

The Court is not persuaded that Donnenfeld's fraudulent inducement claim is based on misrepresentations collateral to the Ceiling Price Contract. To support the claim, Donnenfeld relies primarily on Petro's description, on its website, of its ceiling price plan. As noted above, that description read, in relevant part, "Many customers feel this plan is a better option than the fixed price plan as it gives you a limit on how high your price can go and hopefully take advantage of lower prices in the future." (Am. Compl. ¶ 4.) Donnenfeld asserts that this statement constituted a misrepresentation that ceiling price plan customers would save money on home heating oil if market prices fell, which induced him to enter into the Ceiling Price Contract. These alleged misrepresentations are the same contractual representations that Donnenfeld alleges Petro breached—namely, that, under a ceiling price plan, his oil prices would decline with market conditions.

In his opposition, Donnenfeld additionally argues that Petro employees, including Mike Perna, made oral misrepresentations during telephone calls. However, plaintiff's only allegations to that effect are entirely conclusory. (*See, e.g.*, *id.* ¶ 5 ("[Representatives of Petro advise customers . . . both orally and in writing that ceiling price customers will reap the benefits when market rates fall.").) These vague allegations do not satisfy Rule 9(b), and thus cannot salvage the fraudulent inducement claim.

Accordingly, the motion to dismiss the fraudulent inducement claim is granted. Because the Court does not believe that a claim for fraudulent inducement would

---

[5] Although this claim is entitled "Fraudulent Concealment/Nondisclosure" in the complaint, the allegations center on inducement. (*See, e.g.*, Am. Compl. ¶ 77 ("These statements were made with the intent to induce customers, such as Donnenfeld, and did induce him to switch from the Fixed Price Plan to the Ceiling Price Plan.").) Moreover, the parties' briefing on the motion to dismiss focuses on fraudulent inducement. The Court analyzes the claim accordingly.

necessarily be futile, however, it will grant plaintiff an opportunity to amend the claim.[6]

F. New York General Business Law

Plaintiff asserts claims under New York General Business Law ("GBL") Sections 349 and 350. Section 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service." Section 350 prohibits "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state." These provisions "contemplate[] actionable conduct that does not necessarily rise to the level of fraud" and "encompass[] a significantly wider range of deceptive business practices." *Claridge v. N. Am. Power & Gas, LLC*, No. 15-CV-1261 PKC, 2015 WL 5155934, at *3-4 (S.D.N.Y. Sept. 2, 2015) (quoting *Gaidon v. Guardian Life Ins. Co. of Am.*, 94 N.Y.2d 330, 343 (1999)).

To state a claim under either section, "a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice." *Orlander v. Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015) (quoting *Koch v. Acker, Merrall & Condit Co.*, 18 N.Y.3d 940, 941 (2012)). Petro argues that the complaint fails to plead consumer-oriented conduct and injury. For the reasons discussed below, the Court disagrees.

1. Consumer-Oriented Conduct

Petro argues that Donnenfeld has failed to allege that its conduct was consumer-oriented. It asserts that the dispute is essentially a private one, and that Donnenfeld has failed to identify other customers with similar complaints against Petro.

Conduct is "consumer oriented" under the GBL if it "has a broader impact on consumers at large" as opposed to on just the plaintiff. *See Shapiro v. Berkshire Life Ins. Co.*, 212 F.3d 121, 126 (2d Cir. 2000). This requirement has been "broadly interpreted," and is met "so long as the conduct at issue can 'potentially affect similarly situated consumers.'" *Koch v. Greenberg*, 626 F. App'x 335, 340 (2d Cir. 2015) (quoting *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 85 N.Y.2d 20, 26-27 (1995)); *see also Mayfield v. Asia Funding, Inc.*, No. 14–CV–2591 (LAP), 2015 WL 1501100, at *10 (S.D.N.Y. Mar. 31, 2015) ("Courts construe the consumer-oriented requirement liberally").

Here, Donnenfeld alleges that Petro represents on its website that customers who enter into ceiling plan contracts will benefit from decreases in market prices. (*E.g.*, Am. Compl. ¶¶ 4-5, 63.) This allegation is sufficient to meet the relatively low threshold for pleading consumer-oriented conduct. *See, e.g.*, *Casper Sleep, Inc. v. Mitcham*, 204 F. Supp. 3d 632, 644 (S.D.N.Y. 2016), *recons. denied*, No. 16 CIV. 3224 (JSR), 2016 WL 7188788 (S.D.N.Y. Nov. 17, 2016) (defendant's "website, reviews, and disclosures [we]re plainly geared toward consumers," and "'potentially affect[d] similarly situated consumers' because readers of the website browse[d] the same site and [we]re subject to the same allegedly deceptive conduct."); *Williamson v. Stryker Corp.*, No. 12 CIV. 7083 CM, 2013 WL 3833081, at *14 (S.D.N.Y. July 23, 2013) ("The representations on the website were

---

[6] Petro argues that Donnenfeld should not be given an additional opportunity to amend this claim because the claim was previously dismissed with leave to re-plead in the District of New Jersey. As discussed above, that opinion focused primarily on personal jurisdiction. Moreover, it did not specifically address any deficiencies in the fraudulent inducement claim. Accordingly, the Court disagrees that Donnenfeld should not be given an opportunity to amend the claim.

clearly consumer-oriented, as they were directed and available to the public at large through the Internet.").

Additionally, Petro's argument that a complaint must identify other customers who have complained about the same conduct in order to state a GBL claim is meritless. *E.g.*, *Aghaeepour v. N. Leasing Sys., Inc.*, No. 14 CV 5449 (NSR), 2015 WL 7758894, at *14 (S.D.N.Y. Dec. 1, 2015) ("[A] plaintiff need not delay bringing his suit until a defendants' improper conduct harms other individuals as long as the conduct has the potential to affect similarly situated consumers." (quoting *Oswego*, 85 N.Y.2d at 25)); *Bristol Vill., Inc. v. Louisiana-Pac. Corp.*, 916 F. Supp. 2d 357, 368-69 (W.D.N.Y. 2013) ("Plaintiff is not required to identify specific individual consumers who were harmed by Defendant's actions in order to establish a violation of [the GBL].").

2. Injury

Petro also moves to dismiss the GBL claims for failure to allege an injury. Relying on *Orlander*, Petro argues that Donnenfeld must identify both a monetary loss stemming from the deceptive practice and a failure to deliver contracted-for services. 802 F.3d at 302. Although the court in *Orlander* concluded that the plaintiff in that case had established a GBL injury by "alleg[ing] both a monetary loss stemming from the deceptive practice and the Defendant's failure to deliver contracted-for services," it did not hold that that was the only way to allege a GBL injury. Instead, the court clarified that, in any GBL case, "a plaintiff must allege that, on account of a materially misleading practice, she purchased a product and did not receive the full value of her purchase." *Id.* at 302. Numerous courts in the Second Circuit have concluded that this requirement may be satisfied "in the form of an overpayment or 'price premium,' whereby a plaintiff pays more than she would have but for the deceptive practice." *Braynina v. TJX Cos.*, No. 15 CIV. 5897 (KPF), 2016 WL 5374134, at *10 (S.D.N.Y. Sept. 26, 2016) (collecting cases); *see also Daniel v. Mondelez Int'l, Inc.*, 287 F. Supp. 3d 177, 195 (E.D.N.Y. 2018) (explaining that GBL injury may be established by an allegation that a plaintiff overpaid).

Accordingly, Donnenfeld was not required to allege that he did not receive contracted-for services, as the Ceiling Price Contract was not a contract for services. Instead, Donnenfeld was required to allege only that "on account of a materially misleading practice, []he purchased a product and did not receive the full value of h[is] purchase." *Orlander*, 802 F.3d at 302. Because Donnenfeld alleges that, as a result of Petro's allegedly deceptive billing conduct, he repeatedly overpaid for home heating oil (*e.g.*, Am. Compl. ¶¶ 6, 8-9, 11), he has alleged a sufficient injury.

Petro also makes the related argument that any monetary GBL injury must be independent of alleged breach of contract damages. Relying on a Second Circuit decision that pre-dates *Orlander*, some courts have imposed such a requirement. *E.g.*, *Fleisher v. Phoenix Life Ins. Co.*, 858 F. Supp. 2d 290, 304 (S.D.N.Y. 2012) (citing *Spagnola v. Chubb Corp.*, 574 F.3d 64, 74 (2d Cir. 2009)) ("The loss suffered as a result of Phoenix's alleged breach of § 349 must be independent of the loss alleged under the breach of contract claim.").

However, in a recent case, *Nick's Garage, Inc. v. Progressive Casualty Insurance Co.*, 875 F.3d 107 (2d Cir. 2017), the Second Circuit emphasized that no such broad requirement exists under New York law. *Nick's Garage* involved breach of contract and GBL claims against an insurer for allegedly "fail[ing] to pay sufficient funds to fulfill its obligation to return . . . damaged vehicles to pre-accident condition, and

engag[ing] in deceptive practices in claims processing." *Id.* at 111. Both the breach of contract claim and the GBL claim involved the insurer's failure to reimburse labor costs in accordance with competitive rates. *Id.* The Second Circuit found that, under the insurance contracts, the plaintiffs were owed "the amount of money sufficient to return the vehicles to their pre-loss condition. Thus, the difference between what Insurer paid to Garage and the amount necessary to return the vehicles to their pre-loss condition constitutes damages suffered by the insureds." *Id.* at 114. As for whether the plaintiffs had demonstrated a GBL injury, the court similarly concluded that "the vehicle owners were entitled to receive a sufficient amount of money to repair their vehicles to pre-loss condition, and Insurer's alleged failure to pay sufficient sums, if proved, constitutes a sufficient injury." *Id.* at 125. In response to the insurer's argument that the GBL claim should be dismissed because the alleged damages were duplicative of the breach of contract damages, the Court wrote the following: "Insurer argues that the § 349 claims of First-Party Assignors fail because they do not allege an injury independent of their contract damages. The cases on which Insurer relies, however, do not establish such a requirement. Rather, those cases found no GBL injury 'where the plaintiffs alleged damages in the amount of the purchase price of their contracts, but failed to allege that defendants had denied them the services for which they contracted.'" *Id.* (quoting *Orlander*, 802 F.3d at 302 as distinguishing both *Spagnola*, 574 F.3d at 72 and *Sokoloff v. Town Sports Int'l, Inc.*, 778 N.Y.S.2d 9, 10 (1st Dep't 2004)).

Based on this most-recent guidance from the Second Circuit, and given the allegations that Donnenfeld did not receive the full value of his purchase and repeatedly overpaid for home heating oil based on alleged deceptive practices, the Court declines to dismiss the GBL claims for failure to allege a monetary loss independent of the loss caused by Petro's alleged breach of contract.

G. Consumer Protection Laws of Other States

Finally, Petro moves to dismiss the consumer protection claims brought by Donnenfeld, on behalf of the putative class, under various other state laws. Defendant argues these claims should be dismissed because plaintiff lacks standing to assert claims under the consumer protection laws of states where he does not reside.

The Second Circuit recently resolved "considerable disagreement over this question in the district courts" in *Langan v. Johnson & Johnson Consumer Cos.*, 897 F.3d 88, 93 (2d Cir. 2018). *Langan* involved claims against Johnson & Johnson Consumer Companies, Inc. for deceptive labeling. *Id.* at 91. Johnson & Johnson argued that the plaintiff, a resident of Connecticut, "lacked standing to represent putative class members whose claims [we]re governed by the laws of states other than Connecticut." *Id.* at 92. The Second Circuit rejected the argument and held that, "as long as the named plaintiffs have standing to sue the named defendants, any concern about whether it is proper for a class to include out-of-state, nonparty class members with claims subject to different state laws is a question of predominance under Rule 23(b)(3), not a question of 'adjudicatory competence' under Article III." *Id.* at 93 (citations omitted).

Here, the parties do not dispute that Donnenfeld has standing to sue Petro, and the Court likewise finds that requirement satisfied. Accordingly, defendant's motion to dismiss the claims brought on behalf of customers residing outside of New York is denied.

13

## IV. Conclusion

For the foregoing reasons, the Court grants defendant's motion to dismiss the claims for breach of the covenant of good faith and fair dealing and fraudulent inducement. The Court otherwise denies the motion. Plaintiff is granted leave to amend the claim for fraudulent inducement, and must do so within thirty (30) days of the date of this Order. A failure to do so will result in a dismissal of that claim with prejudice.

SO ORDERED.

JOSEPH F. BIANCO
United States District Judge

Dated: September 12, 2018
Central Islip, NY

\* \* \*

Plaintiffs are represented by Diane E. Sammons, Bruce H. Nagel, and Randee M. Matloff of Nagel Rice, LLP, 230 Park Avenue, Suite 1000, New York, New York 10029.

Defendant is represented by Maura Barry Grinalds and Jonathan J. Lerner of Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York 10036.